UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------X

C.B. and R.B. on behalf of W.B.,

               Plaintiffs,

    - against -

NEW YORK CITY DEPARTMENT
OF EDUCATION,

               Defendant.

-----------------------------------------------------X

**MEMORANDUM
AND    ORDER**

02 CV 4620 (CLP)

On July 30, 2002, plaintiffs C.B. and R.B. commenced this action[1] against District 22 of

the New York City Department of Education ("District 22" or the "District"), on behalf of their

son, W.B., a young boy with an autism disorder, PDD(NOS).[2]   Pursuant to the Individuals with

Disabilities Education Act ("IDEA") (formerly known as the Education of the Handicapped Act

("EHA")), 20 U.S.C. § 1400-1445 (1999),  plaintiffs seek modified <u>de novo</u> review of the June

13, 2001 decision of an administrative hearing officer and the April 19, 2002 decision of the

State Review Officer, finding that despite W.B.'s eligibility to receive certain special education

services and the District's failure to provide such services, W.B.'s parents were not entitled to

receive any reimbursement for the alternative special education school and related services that

they secured for W.B.  On May 13, 2003, parties consented to jurisdiction before the

undersigned.

-----

[1]Plaintiffs initially commenced this action in the Southern District of New York on July
30, 2002.  The case was subsequently transferred to this Court on August 16, 2002.

[2]"PDD(NOS)" stands for pervasive developmental disorder, not otherwise specified,
which is a disorder on the autism spectrum.  (<u>See</u> Plaintiffs' Memorandum of Law dated May 30,
2003 ("Pls.' Mem.") at ix n. 7).

Defendant has cross-moved for summary judgment, contending that there are no issues of fact in dispute and that the decision of the State Review Officer, affirming the decision of the administrative hearing officer, was not in error.

## FACTUAL BACKGROUND

Plaintiff W.B.[3] was born on July 4, 1994 and was diagnosed in February 1998 with pervasive developmental disorder ("PDD"), an autism spectrum disorder. (Def's. 56.1 Stmnt ¶¶ 3-4; Compl. ¶ 1; Hrg. Rec. Ex. 2 at 2-2).[4] W.B.'s parents, C.B. and R.B., reside with W.B. at an address in Brooklyn,[5] within District 22. (Compl. ¶ 2).

Pursuant to the IDEA and Article 89 of the New York State Education Law, N.Y. Educ. Law §§ 4401 et seq., the Board of Education is required to provide a free appropriate public education to eligible residents of New York City between the ages of 3 and 21 who have been classified as children with disabilities in need of special educational programs, as well as services

---

[3] Pursuant to the Individuals with Disabilities Education Act ("IDEA") and the Family Educational Rights Privacy Act of 1974 ("FERPA"), neither W.B. nor his parents are expressly named nor is there an exact address provided in order to guarantee their privacy. 20 U.S.C. § 1412(a)(8); 20 U.S.C. § 1417(c); 20 U.S.C. § 1232g.

[4] Citations to "Def's 56.1 Stmnt" refer to paragraphs in the Defendant's Local Civil Rule 56.1 Statement of Material Facts Not in Dispute. Citations to "Compl." refer to paragraphs in Plaintiffs' Complaint, dated July 25, 2002. Citations to "Hrg. Rec." refer to the exhibits submitted into evidence at the Impartial Hearing, attached as Ex. B to the Declaration of Abigail Goldenberg, Esq., in support of Defendant's Cross-Motion for Summary Judgment, dated July 14, 2003 ("Goldenberg Decl.").

[5] The Complaint alleges that plaintiffs reside at an address within the Southern District of New York (Compl. ¶ 3), which would raise issues of venue if accurate. However, based on documents submitted in connection with this motion, it appears that the Complaint is in error and the plaintiffs reside in Brooklyn within the Eastern District of New York. (See Hrg. Rec., Exs. 1, 6, 14, 23).

tailored to meet the needs of each child. (Def's. 56.1 Stmnt ¶ 1; Compl. ¶ 8).

A. W.B.'s Placement for the Year 1999 to 2000

On August 7, 1997, the Committee on Preschool Special Education ("CPSE") conducted an evaluation of W.B. and classified him as having a disability. (Hrg. Officer's Findings [6] at 4). It was recommended that W.B. receive individual SEIT services,[7] as well as occupational therapy, physical therapy and language speech therapy in a center-based twelve-month program. (Id.) In November 1997, CPSE recommended an increase in the amount of SEIT services and speech and language services provided to W.B. (Id.)

In February 1998, W.B.'s parents suggested that W.B. might benefit from Applied Behavioral Analysis ("ABA") therapy, which is a form of treatment for autistic preschoolers that breaks activities into discrete individual tasks and rewards the child's accomplishments, eventually leading to an integration of the instructions with the activity. (Id. at 4 n.1). CPSE agreed and recommended additional increased SEIT services, which were increased to 27.5 hours per week in September 1998. (Id. at 4).

In May 1999, the Committee on Special Education ("CSE") conducted a review of W.B. since he had aged out of preschool. (Id.) Following that review, the CSE, pursuant to the IDEA,

---

[6]Citations to "Hrg. Officer's Findings" refer to the Hearing Officer's Findings of Fact, attached as Ex. D to Goldenberg Decl.

[7]"SEIT" services refer to the services of a Special Education Itinerant Teacher. SEIT services are part of preschool services under New York law (Hrg. Officer's Findings at 6; Hrg. Rec., Ex. 22), where a "preschool child" is defined as "a child with a disability . . . who will not have become five years of age on or before December first of the school year, or a later date if a board established such later date for eligibility to attend school." N.Y. Educ. Law § 4410(1)(i).

20 U.S.C. § 1415, recommended that for the 1999-2000 school year, W.B. be placed in a Modified Instructional Services - IV Program ("MIS-IV"), with related services, including speech/language therapy, occupational therapy and physical therapy. (Id.; Def's. 56.1 Stmnt ¶ 4; SRO Decision[8] at 2).

In response, W.B.'s parents requested a higher level of service, and on July 30, 1999, the CSE recommended that W.B. be placed in a Specialized Instructional Environment ("SIE") III program. (Hrg. Officer's Findings at 4-5). The parents were issued a "Nickerson Letter,"[9] entitling them to a non-public school placement ("NPS") in a New York State Education Department approved school. (Id.) When the parents were unable to find an approved private school, and the school district had failed to provide an appropriate public placement, W.B. was enrolled in a regular pre-kindergarten class at Kings Bay YMHA and YWHA (the "Y"), a private preschool program. His parents also arranged for ABA instruction to be provided for him at home and SEIT services to be provided at school. (Id. at 4-5; see also Hrg. Rec., Exs. 1, 2, 3, 6, 7, 8). At the Y, W.B. attended class with 19 other students,[10] one para-professional, and his own

---

[8]Citations to "SRO Decision" refer to the State Review Officer's Decision dated April 19, 2002, attached as Ex. A to Goldenberg Decl.

[9]See A.T. and I.T. v. New York State Educ. Dep't, No. 98 CV 4166, 1998 WL 765371, at *1 (E.D.N.Y. Aug. 4, 1998) (citing Jose v. Ambach, 669 F.2d 865 (2d Cir. 1982)).

[10]Although the Hearing Officer's report indicates that there were 19 children in W.B.'s class at the Y, there was also testimony that in fact there were two sessions to the Y program and that there may have only been 13 children in the class at one time. (See Transcript of the impartial hearing held on January 2, 2001 ("Tr. II") at 50). The transcripts of the other days of the impartial hearing proceedings are cited herein as follows: the transcript of the first day of proceedings held on October 3, 2000 is referred to as "Tr. I;" "Tr. III" refers to the proceedings on January 4, 2001; "Tr. IV" refers to the proceedings on January 12, 2001; "Tr. V" refers to the proceedings on February 6, 2001; and "Tr. VI" refers to the transcript of the impartial hearing proceedings held on February 12, 2001.

4

"shadow teacher" or SEIT, trained in ABA, whose services were paid for by W.B.'s parents. (Hrg. Rec., Ex. 6 at 6-3; Tr. IV at 235-36).

W.B.'s parents subsequently requested an impartial hearing seeking reimbursement for 27.5 hours of SEIT/ABA services by an ABA trained teacher, in addition to reimbursement for the tuition resulting from their placement of W.B. in the pre-kindergarten program at the Y. (Hrg. Officer's Findings at 5). The hearing began on October 29, 1999 and the hearing officer issued an Interim Order granting the request for 27.5 hours of SEIT/ABA pending a final decision. (Id.)[11] In December 1999, the hearing officer determined that the school district had not complied with the Interim Order and on January 10, 2000, he reissued the order in writing as a "Statement of Agreement and Interim Order." (See Stmnt of Agreement at 2).[12] Although the actual Interim Order is not in evidence, it is clear from the record and from the final Statement of Agreement issued by the Hearing Officer on March 14, 2002, that the 27.5 hours of SEIT/ABA

---

[11]Section 1415(j) of the IDEA sets forth the IDEA's "pendent placement" or "stay put" provision. It provides in pertinent part: "During the pendency of any proceedings conducted pursuant to this section, unless the state or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then-current educational placement of such child." 20 U.S.C. § 1415(j). Under state and federal law, a child should remain in his then current educational placement during the pendency of any proceedings relating to the evaluation or placement of the child. 20 U.S.C. § 1415(j); N.Y. Educ. Law § 4404(4). The purpose of this provision is to provide stability and consistency for the child. See Murphy v. Arlington Cent. Sch. Dist., 86 F. Supp. 2d 354, 356 (S.D.N.Y. 2000); Board of Educ. of New York v. Ambach, 612 F. Supp. 230, 233 (E.D.N.Y. 1985) (noting that "[a]nother safeguard, provided in 20 U.S.C. § 1415(e)(3), is intended to maintain some stability and continuity in a child's school placement during the pendency of review proceedings"). A determination of pendency placement is independent of the ultimate decision regarding the appropriateness of the placement. See Murphy v. Arlington Cent. Sch. Dist., 86 F. Supp. 2d at 356.

[12]Citations to "Stmnt of Agreement" refer to the Statement of Agreement issued by Hearing Officer Eric S. Zaidins, Esq., dated March 14, 2002, concluding the 1999-2000 hearing, submitted as Ex. F to Goldenberg Decl.

5

services were granted in addition to and independent of W.B.'s attendance at the Y; these hours were not meant to substitute for placement in the Y.[13] (See id. at 3).

## B. W.B.'s Placement for the Year 2000 to 2001

Beginning in March 2000, CSE reevaluated W.B. and prepared a social history, a psychological evaluation and an educational evaluation. (Hrg. Officer's Findings at 5; Hrg. Rec., Exs. 1, 2, 6). In addition to observing W.B. in his classroom setting at the Y, progress reports were obtained from his teachers and service providers. (Hrg. Rec., Exs. 9, 10, 11, 12, 13). Carol Tuchfeld, an education evaluator for the District, evaluated W.B. in April 2000 and described him as "distractible and unfocused for much of this assessment." (Id., Ex. 6 at 6-3). She did, however, indicate that he had made progress since his last evaluation. (Id.) Ms. Tuchfeld noted that W.B. plays by himself and when frustrated will cry until redirected to correctly perform the task. (Id.)

Similar comments were made by another observer, S. Lindau, who observed W.B. in his classroom at the Y on April 3, 2000, noting W.B.'s lack of interaction with other children, his communication with his "shadow" teacher, and the conclusion of W.B.'s regular teacher that W.B. is a "sweet, cooperative boy who needs someone with him at all times." (Id., Ex. 7 at 7-1). This report also noted that W.B. "[r]eceives A.B.A. (paid by parents) at home." (Id.) Another observer noted that W.B. seemed to be accepted by his peers, holding a girl's hand on the way to

---

[13]Moreover, while there is some testimony by W.B.'s mother at the 2000-2001 hearing that indicates that the parents may have disagreed with the CSE's recommendation of a non-public SEI-III placement (Tr. IV at 236-37), both the Hearing Officer and the State Review Officer in the subsequent hearing found that there was no appropriate placement offered for W.B. in the 1999 - 2000 school year and the parents were left with no option but to keep him at the Y.

swimming, but he was "non-expressive" either verbally or by visible affect. (Id., Ex. 8 at 8-1).

On May 22, 2000, CSE held a meeting, at which time it was recommended that W.B. attend an MIS IV integrated program at P.S. 206 with a full-time crisis management para-professional, and speech/language, physical and occupational therapy. (Hrg. Officer's Findings at 5). However, the general education teacher and W.B.'s at home ABA teacher were not present when the decision was made to place W.B. in P.S. 206, although the general education teacher did participate in the meeting for approximately ten minutes by phone. (Id.)

On that same date, May 22, 2000, R.B. requested that CSE consider placing W.B. in a program with the Star Institute ("Star") which, according to the supervisor of Star was created specifically to address the special needs of high functioning children with PDD(NOS). (Tr. VI at 534). Although Star is a private entity which lacks the approval of the State Education Department (Hrg. Officer's Findings at 3), the parents applied to the Star Institute for W.B. in April of 2000. (Id. at 5-6). W.B.'s father explained that the parents put a deposit down at Star to hold a place for W.B. because in the prior year, by the time they finally got the Nickerson letter and attempted to apply to the schools on the approved list, the schools were all full. (Tr. VI at 502). He explained: "Just to get your child in a placement is an almost impossible task. There are many more children needing these spots than there are places." (Id.) W.B.'s father testified that even one school that had promised to save a space for W.B., Blue Feather, told the parents when they finally got the Nickerson letter that there was no space for W.B. (Id.) As a result, the parents "really - - [] had no idea where [their] son would be." (Id. at 523).

The parents had approached the Y at the beginning of the summer in an effort to provide W.B. with some sort of structured summer program. (Id. at 522-23). According to W.B.'s

7

father, the Y was "very leery of taking this child with autistic spectrum disorder." (Id. at 523). However, after the parents provided a trained teacher to follow W.B. all summer in the Y classroom, the Y agreed to keep W.B. on for the school year. (Id.) The Y director made it clear that the placement would only be for that year; the director told W.B.'s father, "Only one year because after that it's just not good for your son." (Id.) Given the problems encountered in finding a space for W.B. for the school year 1999-2000, and the fact that it was unclear that the program promised at P.S. 206 would actually be in existence in September, W.B.'s parents reserved a place at Star to avoid being left without a placement, as had occurred the year before. (Id. at 502-503).

While R.B.'s request for placement in the Star Institute was pending, W.B.'s father visited P.S. 206 in June 2000.[14] Based on his visit, W.B.'s father did not feel that the MIS IV class would be appropriate for W.B. He testified that he had been under the impression from the May 22, 2000 CSE meeting that the program at P.S. 206 was going to consist mostly of children like W.B., with teachers knowledgeable in ABA and with an ABA component to the class. (Tr. IV at 315). It was not until he got to the school and spoke to Rhonda Dawn Farkas, the assistant principal of P.S. 206, that he learned that the program was an "integrated program" with "very, very little special ed." (Id. at 321). He found the "large noisy environment" with regular education children to be inappropriate for W.B. (Hrg. Officer's Findings at 5). He testified that he observed the children engaged in a science class at what appeared to be the third or fourth

_____

[14]W.B.'s father testified that after the May 22, 2000 CSE meeting where the program at P.S. 206 was discussed, he asked immediately for an opportunity to visit the classroom, but he was told "you cannot see it . . . . its not in existence until next September." (Tr. IV at 318). Indeed, the psychologist told W.B.'s father that his best chance of getting approval for the Star program was if the P.S. 206 program did not get off the ground. (Id.)

grade level; in his view, "[i]t was not geared to a child that can't participate based on processing situation [sic]." (Tr. IV at 323). Moreover, at that time, there was no ABA instruction available at P.S. 206 and Ms. Farkas "had no knowledge at that time of ABA or anything like that in the class." (Id. at 321). W.B.'s father was not told at that time that the staff at P.S. 206 would eventually receive training in ABA. (Hrg. Officer's Findings at 5).[15]

In June 2000, Cecelia McCarton, M.D., noted that W.B. "can get very over-stimulated and agitated during car trips when they exceed 30 minutes." (Hrg. Rec., Ex. 13 at 13-1). She recommended that transportation to and from school should not exceed 30 minutes and should have minimal stops. (Id.) The CSE then reconvened on June 27, 2000 and W.B.'s Individualized Education Program ("IEP") was amended to indicate that W.B. should not have to ride a bus for more than 30 minutes to get to school. (Hrg. Officer's Findings at 5). Also, at that time, the parents' request to place W.B. in the Star program was denied.

C. The Hearing

The parents ultimately disagreed with the District's placement of W.B. at P.S. 206 and placed W.B. in the Star program. (Hrg. Officer's Findings at 6). In addition, they arranged for an in-home program of 7 to 9 hours of ABA therapy per week. On August 11, 2000, the parents requested approximately $24,500 in tuition reimbursement for the 2000-2001 school year in the Star program and for at home ABA services, arguing that the district had failed to offer W.B. a free and appropriate public education. (Id. at 6, 11).

---

[15]Indeed, during the hearing that is the subject of this action, Ms. Farkas admitted that at the time of the father's visit, ABA instruction was not in place and she did not even know about ABA until after the visit. (Hrg. Officer's Findings at 9).

The District, in response, argued that W.B. had "always been educated in an integrated setting, using an ABA approach," and that the District's recommended program was not only "appropriate" but "preferable to the one selected by the parents." (Tr. I at 14). The District opposed the parents' request for 27.5 hours of SEIT services,[16] arguing that SEIT services were only available as part of pre-school services and that the program that was provided by the parents was disjointed because it did not include ABA services integrated into the school day. (Id. at 16).[17]

A hearing on plaintiffs' challenge to the recommended placement of W.B. at P.S. 206 and their application for tuition reimbursement began on October 3, 2000 before Hearing Officer, Linda Agoston, Esq., appointed pursuant to the IDEA, 20 U.S.C. § 1415(f)(3). The hearing continued with adjournments over the course of several days, concluding in February 2001. During the course of the hearing, the District presented a number of witnesses, who assessed W.B.'s abilities and made recommendations as to the plans for W.B.'s education. Among other things, the District's witnesses endorsed the CSE's recommendation that W.B. be placed in an MIS IV integrated classroom with special education instruction. (Hrg. Officer's Findings at 7).

Edward Frank, a school psychologist, performed a psychological evaluation of W.B. in May 2000. (Tr. I at 26). He found W.B. to be "a self-absolved [sic] youngster with limited

---

[16]At the hearing, counsel for the parents made it clear that they were not requesting 27.5 hours of ABA services. (Tr. I at 19). Counsel noted that the 27.5 hours had been specified in the pendency order and they were simply requesting that that amount remain in place until the impartial hearing had been completed. (Id.; see discussion infra at 17-20). Rather, counsel indicated that the parents were actually requesting closer to 20 hours of services. (Id.)

[17]According to the testimony of Jennifer Strazzeri, W.B.'s ABA teacher, W.B. had never had ABA training in the classroom. (Tr. V at 411; see discussion infra at 12-13).

ability to attend and persevere." (Id. at 30). He described W.B. as "easily confused" with a tendency to "withdraw." (Id.) Mr. Frank felt that W.B. needed "a structured program . . . . that will be able to focus him and be able to keep him on track and offer him molds of what's normal and appropriate for children his age." (Id. at 33). Although Mr. Frank supported the District's program, he conceded that he had never seen the P.S. 206 classroom, did not know how many children were in the class, did not know how much of the day was spent in special education and admitted that he did not know much about ABA (Id. at 47-51, 69); "I am not an ABA expert." (Id. at 47).

Carol Tuchfeld met with W.B. in April 2000 at her office and concluded that he needed peer models and could receive an education in the less restrictive environment presented by the P.S. 206 MIS IV program. (Hrg. Officer's Findings at 8; Tr. II at 6-12). However, she admitted that she did not spend much time with W.B. during her evaluation because he was distracted. (Tr. II at 7-8). She also conceded that in reaching her evaluation of W.B., she never observed W.B. at the Y, but simply relied on the analysis of W.B.'s teacher, who said he had made progress at the Y and thought he should be in an integrated setting the following year. (Id. at 11, 46). Ms. Tuchfeld had also never seen the P.S. 206 classroom where W.B. was to have been placed. (Id. at 82).

Carol Tuchfeld did visit the Star program but only once in September 2000 when W.B. had just started. (Tr. VI at 556). Despite an invitation from Jeanne Angus, Supervisor of the Star Institute, Ms. Tuchfeld did not return for a second visit to assess W.B.'s progress. (Id. at 555-56). Ms. Angus opined that it was "certainly an inadequate assessment." (Id. at 556). Moreover, there was also evidence that Ms. Tuchfeld had failed to obtain the parents' permission prior to

11

that September visit. (Id. at 553-54).[18]

Ms. Tuchfeld conceded that she was not personally trained or particularly familiar with ABA and she never saw the evaluation of plaintiffs' doctor, Dr. McCarton, who recommended that "in terms of next September, it would be best for [W.B.] to be in a special education kindergarten." (Tr. II at 63). Nor was she aware that Dr. McCarton had suggested the Star program, along with two others, as appropriate placements for W.B. (Id.)

Rhonda Farkas, the assistant principal of P.S. 206, testified about the program at P.S. 206. (Tr. III at 98). She described the proposed first grade class for W.B. at P.S. 206 as consisting of 19 regular education children and two special education children, taught by a veteran teacher, an early education teacher, a part time special education teacher and two para-professionals. (Id. at 99-100). She conceded, however, that she had never supervised an ABA program before and indeed, her first real experience with ABA was in June 2000, when she observed a class in which ABA was being used. (Id. at 126, 130). She also conceded that she had never met W.B. and had never reviewed any records relating to W.B. (Id. at 159).

In response, the parents called Jennifer Strazzeri, a special education teacher trained in ABA. Ms. Strazzeri testified that she had worked with W.B. for four years, providing SEIT support in school and ABA training at home. (Tr. V at 369, 375-76). She began working with W.B. in his preschool prior to his joining the Y, and she continued with him during his year at

---

[18]Under the law, the District is required to obtain the parents' consent before conducting an evaluation of the child, particularly when the child is at a different school system. (Tr. II at 16-17); see N.Y. Educ. Law § 4410(4)(c); N.Y. Comp. Codes R. & Regs. tit. 8 § 200.16(b)(1)(iv); 20 U.S.C. § 1414(a); see also Ray M. v. Board of Educ., 884 F. Supp. 696, 701 (E.D.N.Y. 1995). Ms. Tuchfeld admitted that she had failed to obtain the parents' permission prior to her visit and therefore, her testimony as to what she observed of the Star program on that occasion was excluded by the Hearing Officer. (Tr. II at 16, 19).

the Y and up through the date of the hearing. (Id. at 376-78).  She explained that previously, he

was receiving as much as 16 hours of ABA training, but due to the parents' financial difficulties,

that amount had been reduced to nine hours. (Id. at 379-80).  She explained that the ABA

training was given to W.B. in the home, that "[w]e didn't do ABA in the school. . . . He never got

ABA in the school." (Id. at 393).  She explained that instead W.B. was provided SEIT support in

school, which involved assisting him in following the teacher's directions, but it was not ABA

training. (Id. at 393-95).  She explained that when he was receiving more ABA at home, she was

able to teach W.B.'s parents how to deal more consistently one-on-one when he was

experiencing "negative behaviors." (Id. at 388).  With the reduction in ABA hours at home, Ms.

Strazzeri saw an increase in W.B.'s negative behaviors. (Id.)

Ms. Strazzeri testified that she had observed W.B. in the classroom at Star and that "[h]e

was able to function in the classroom without a one-on-one person." (Id. at 383).  She testified

that "[i]t was a much smaller class [than the Y].  So he was given a lot more attention as opposed

to the larger classes that he's been in with the one-on-one." (Id.)  She found that he was able to

follow routines in the classroom, that he seemed "very comfortable, very happy," and that he got

along well with his peers in the classroom, who seemed to be on the same or similar levels of

functioning. (Id. at 384).  In her opinion, there were "not too many negatives [with Star.]" (Id. at

386).  She noted that he had become sufficiently independent that he did not need SEIT services

at Star, and she felt that the Star program was "a good fit for him." (Id. at 403).  She further

opined that if he had a more consistent program of ABA at home, this would assist in keeping the

negative behaviors under control. (Id. at 405).

Jeanne Angus, M.A., Senior Psychologist and Supervisor of the Star Institute, was also

13

called as a witness by the parents. She testified that she had observed W.B. in his classroom at the Y and would never design a program where W.B. would be placed in a classroom of 21 children because he has problems with focus. (Tr. VI at 534-37). She felt that he was "in need of [a] more specific type of structure and attention as compared to other children in the class." (Id. at 537-38). Ms. Angus testified that the District's program, consisting of 21 children, four of whom have classified issues, would not have been an appropriate setting for W.B. She described it as "too much stimulus," "overpowering and debilitating to this youngster." (Id. at 545). He would not be able to participate in the classroom even with a one-on-one paraprofessional. (Id.) She described it as "a very inappropriate setting for him." (Id.) She testified that in the Star program, which was created specifically to address the needs of children like W.B. with PDD (NOS), there were nine children, with a head teacher who has a Masters Degree in Special Education, and two classroom assistants, one with a Bachelors degree. (Id. at 538-39). There was an additional teacher specifically assigned to another child who also participates. (Id.) The focus of the program is on developing independent skills, initiating interactions, with "more stress upon language and the use of language as a response." (Id. at 538).

D. The Hearing Officer's Opinion

    1) The 2000-2001 School Year

At the conclusion of the hearing, the Hearing Officer issued an opinion on June 13, 2001, finding the District's IEP and proposed placement to be inappropriate, but denying the parents' request for reimbursement. In considering the parents' request, the Hearing Officer relied on the factors set forth in School Committee of Burlington v. Department of Education of

14

Massachusetts, 471 U.S. 359 (1985). The reviewing officer articulated the factors in a three-part test. Under this test, the reviewing officer is to determine: (1) whether the services offered by the District are "inadequate or inappropriate;" (2) whether the services provided by the parents are appropriate; and (3) whether there are "equitable considerations" that support the parents' claim for reimbursement.[19] (Hrg. Officer's Findings at 17).

In evaluating the first factor - - the appropriateness of the District's placement and offered services - - the Hearing Officer noted in her opinion that: "It is undisputed that the IEP that resulted from the May 22, 2000 [meeting] was procedurally flawed as the meeting did not constitute a valid meeting because the required members were not present, e.g., the general education teacher who participated for ten minutes by phone and [W.B.'s] ABA providers who were not present." (Id. at 11). The Hearing Officer also concluded that the program offered by the Board was inadequate, noting: "The cases unanimously hold that an invalidly constituted CSE always results in an invalid IEP." (Id. at 17). In addition to these procedural deficiencies, the Hearing Officer also found that the IEP was "substantively" flawed as well because an appropriate behavioral plan and "meaningful goals" were not provided. (Id. at 17-18). Among other things, the IEP provided only a ten-month program whereas W.B. needed a twelve-month program. (Id. at 18). Thus, for a variety of reasons, the Hearing Officer concluded that the District's program offered to W.B. was "inappropriate."

---

[19]This Court notes that the third Burlington factor articulated by the Hearing Officer is not properly a part of the two-part Burlington test. See M.C. v. Voluntown Bd. of Educ., 226 F.3d 60, 66-67 (2d Cir. 2000) (holding that "'once the Burlington two-factor test is satisfied, parents can obtain reimbursement for privately obtained educational services . . . .'") (quoting Still v. DeBuono, 101 F.3d 888, 891 (2d Cir. 1996); see also Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 15-16 (1993). Indeed, the "equitable considerations [] relevant in fashioning relief" address this Court's equitable powers to order appropriate relief under the IDEA. School Comm. of Burlington v. Department of Educ. of Mass., 471 U.S. at 373-74; see discussion infra at 28-29.

15

As to the appropriateness of the program provided by the parents, the Hearing Officer noted that although the Star program was not a State-approved school, that fact alone was not dispositive of the parents' request. (Id. at 18 (citing Florence County Sch. Dist. Four v. Carter, 510 U.S. at 14)). The Hearing Officer, based on the evidence, found that W.B.'s "current class at the Star is more appropriate with a staff-to-student ratio of 2:9 than the Board's placement with a staff-to-student ratio of 2:21." (Id.) The Hearing Officer also noted that the Star program grouped W.B. with children functioning at the same grade and age level and with comparable abilities as W.B. in accordance with N.Y. Comp. Codes R. & Regs. tit. 8 § 200.6(a)(3), and that Star provided a twelve-month program which W.B. needed. (Id. at 18-19).

However, the Hearing Officer concluded that the overall program provided by the parents was not appropriate because W.B. received only 9 hours of ABA therapy. (Id. at 19). Although the parents' witnesses indicated that 27.5 ABA hours would be beneficial for W.B., the Hearing Officer commented that W.B.'s mother "maintained that she did not want W.B. to receive more than nine hours of ABA."[20] (Id.) The Hearing Officer seemingly rejected both views, finding nine hours of ABA therapy to be too little, but also finding that "27.5 hours of ABA as well as a full time schedule of 9 a.m. to 3 p.m. at Star represents a burdensome schedule for the child." (Id.) Without specifying what amount of ABA training she felt was appropriate for W.B., the Hearing Officer simply concluded that "the parents could have chosen one of a number of

_____

[20]In reality, the record reflects not that the mother objected to additional hours, but rather that she responded "yes" when asked if she was "comfortable with that level as helping to produce meaningful educational progress for [her] son." (Tr. IV at 253). Indeed, it was very clear from the transcript that the parents had been pleased with W.B.'s progress when afforded more hours of ABA, but that the parents could not afford to pay for more than the nine hours, particularly since they "never received any payment from the Board of Ed. . . . Not a cent, not a penny, nothing. Zero, zilch, nada," despite the pendency order from the earlier hearing officer. (Id. at 239, 259).

available integrated ABA/academic programs,"[21] rather than selecting Star which has "no ABA component." (Id.)

Having concluded that the parents' program was inappropriate as well, the Hearing Officer denied reimbursement, but ordered the Board to reconvene to determine the appropriate number of hours of ABA required for W.B. and to recommend an appropriate program. (Id. at 19-20).

### 2) The Pendency Placement

During the course of the proceedings before Hearing Officer Agoston, W.B.'s parents sought a pendency determination for the 2000 to 2001 school year. However, on June 13, 2001, when Hearing Officer Agoston issued her decision for the year 2000 to 2001, the prior pendency hearing for the year 1999 to 2000 was still ongoing and no final determination had been made in that proceeding. (Id. at 5 n.2). As a consequence, Hearing Officer Agoston declined to make a pendency determination for the 2000 to 2001 school year because she found that the prior pendency determination was still in place.

Hearing Officer Agoston noted that although the parties were given the opportunity to pursue the pendency claim at the outset of the 2000-2001 hearing, neither of the parties pursued the pendency issue until May 16, 2001, approximately one month before the final determination of the Hearing Officer on June 13, 2001. (Id. at 3). Therefore, since the June 13, 2001

---

[21]It is notable that despite the Hearing Officer's reference to other "available integrated ABA/academic programs," neither the Hearing Officer nor the District has identified any such alternatives that would have been appropriate for this child. Indeed, it is curious that if such programs were available, the District nonetheless chose to place W.B. in P.S. 206, which was clearly not appropriate. See discussion infra at 36, 45-46.

determination was for the 2000-2001 school year, which was almost over,[22] the Hearing Officer

found that the need for a pendency determination at that late date was "obviated." (See id.). In

addition, the Hearing Officer noted that W.B. had aged out of SEIT services during the 2000-

2001 school year. (Id.)

In fact, although the final hearing date for the prior pendency hearing was held on May

10, 2001, the impartial hearing officer assigned to that first proceeding did not officially

terminate the matter until March 14, 2002,[23] when he issued a Statement of Agreement ordering

the school district to reimburse the plaintiffs for SEIT/ABA services and support aid for the

program at the Y for the school year 1999-2000. (Stmnt of Agreement at 2-3).

---

[22]Since the Hearing Officer found that W.B. required a twelve-month program and year round services (Hrg. Officer's Findings at 18), it is unclear why the pendency issue was "obviated" since the District at that time still had not proposed an appropriate IEP for W.B. for the remainder of the year. Although the Hearing Officer noted that W.B. had aged out of SEIT services during the 2000-2001 school year (id. at 4), W.B. had been found to require more than SEIT services; he needed speech and language therapy as well as at home ABA therapy.

[23]The Court notes that both hearing officers in dealing with the plaintiffs' applications for review violated State and Federal regulations which require a decision to be rendered within 45 days of the filing of an application for an impartial hearing. See N.Y. Comp. Codes R. & Regs. tit. 8 § 200.5(i)(4); 34 C.F.R. § 300.511(a); see also M.B. v. Arlington Cent. Sch. Dist., No. 99 CV 9973, 2002 WL 389151, at *7 n.4 (S.D.N.Y. Mar. 12, 2002). One court has commented that "we believe that if unjustified and unreasonable delays in the state review process, which have become an increasing problem, are tolerated by the courts, school districts and the State will have a strong incentive to 'delay administrative decisions as a means of deferring, or worse yet, avoiding financial responsibility.'" Board of Educ. v. O'Shea, 353 F. Supp. 2d 449, 459 (S.D.N.Y. 2005) (quoting Murphy v. Arlington Cent. Sch. Dist., 86 F. Supp. 2d at 367). With respect to W.B., neither hearing officer concluded the review of plaintiffs' application in time for their decision to provide any benefit to W.B. This Court further notes that the State Review Officer in the instant case also took longer than the 30 days mandated by State and Federal regulations to render a decision. See N.Y. Comp. Codes R. & Regs. tit. 8 § 200.5(j)(2); 34 C.F.R. § 300.511(b).

E.  The Decision of the State Review Officer

The parents appealed from the Hearing Officer's decision to the State Education Department and on April 19, 2002, the State Review Officer dismissed the appeal. (SRO Decision at 6).  In his opinion, the Review Officer considered not only the parents' appeal from the Hearing Officer's finding that their program was not appropriate but also the parents' claim that the Hearing Officer failed to consider W.B.'s "pendency placement."[24]  (Id. at 1).

In evaluating plaintiffs' claim that the Hearing Officer erred in finding the Star program inappropriate, the Review Officer agreed with plaintiffs' argument that the Hearing Officer erred by applying a "clear and convincing" standard on review, concluding that under Article Three of the New York State Administrative Procedure Act, decisions in adjudicatory proceedings shall be supported by "substantial evidence." (Id. at 5 (citing N.Y.A.P.A. § 306(1)).

Nevertheless, upon conducting his own independent review of the record, the Review Officer concluded that the parents' program was not appropriate.  The Review Officer acknowledged that both the supervisor of the Star program and the child's ABA provider testified that W.B. needed increased ABA hours at home.  However, the Review Officer also noted that the record was devoid of any evidence explaining what the at home ABA instruction involved or how this would address W.B.'s behavior at school.  The Review Officer also noted that although the Star Institute supervisor testified that the Star program was independently appropriate, he concluded that the program had not met W.B.'s needs and accordingly, denied the parents' request for reimbursement for the 2000 to 2001 school year.[25]

---

[24]See discussion infra at 25, 44-46, 50-51.

[25]It should be noted that the Review Officer did not consider the District's response to plaintiffs' appeal because the District filed its answer late, and thus, the Review Officer "deemed

19

The State Review Officer also rejected plaintiffs' request for a pendency determination. Upon review, the State Review Officer upheld Hearing Officer Agoston's decision to decline to make a pendency placement determination, finding that she had not erred in declining to make a pendency determination since the "parties were still bound by the [prior] hearing officer's [interim] pendency determination." (Id. at 4). The State Review Officer based his finding on the fact that the hearing officer in the 1999-2000 proceeding had "ordered that the parents be reimbursed for [SEIT] services up to 27.5 hours per week." (Id.) However, despite the finding that the pendency determination of the first hearing officer ordered reimbursement to the parents for these services and the clear evidence that defendant had failed to comply with that order, the Review Officer declined to order reimbursement to the plaintiffs for the SEIT/ABA services paid for by the parents during the time when the 2000-2001 hearing overlapped with the 1999-2000 hearing.[26]

DISCUSSION

A. Purposes of IDEA

The IDEA was enacted to promote the education of children with disabilities and "to

---

to be true" the statements contained in plaintiffs' petition.

[26]The Second Circuit has held that "the time frame of the administrative and judicial 'proceedings' under § 1415(e)(3) is not necessarily coterminous with the limits of the school year" and that the "statute would require us to order funding for the duration of the review proceedings." Zvi D. v. Ambach, 694 F.2d 904, 908 (2d Cir. 1982). Thus, it is unclear why the State Review Officer denied the parents' request for reimbursement under the pendency placement. Cf. Board of Educ. of New York v. Ambach, 612 F. Supp. at 233 (noting that "[w]hile the Board finally made an appropriate placement recommendation on its second attempt in May of 1983, it was not relieved of the duty to finance Asher's schooling until the review proceedings were completed in April of 1984").

assure that all handicapped children have available to them . . . a free appropriate public education which emphasizes special education and related services designed to meet their unique needs [and] to assure that the rights of handicapped children and their parents. . . are protected." 20 U.S.C. § 1400(c); see School Comm. of Burlington v. Department of Educ. of Mass., 471 U.S. at 369; Board of Educ. v. O'Shea, 353 F. Supp. 2d at 453. Under the IDEA, states receive federal funding conditioned upon the development of a plan that ensures that handicapped children receive a "free appropriate public education" ("FAPE"). Mr. X v. New York State Educ. Dep't, 975 F. Supp. 546, 552 n.5 (S.D.N.Y. 1997) (citation omitted); see 20 U.S.C. § 1401(8). If a state receiving federal funding fails to provide an appropriate education to a handicapped child, the child's parents may remove the child from the improper placement and enroll the child in an appropriate private school; the parents may then seek retroactive reimbursement for the cost of the private school from the state. Board of Educ. v. O'Shea, 353 F. Supp. 2d at 454 (citing M.S. v. Board of Educ. of Yonkers, 231 F.3d 96, 102 (2d Cir. 2000), cert. denied, 532 U.S. 942 (2001)).

A key element to the success of the IDEA is the development of an independent education plan ("IEP") for each handicapped child that includes, among other things, "a comprehensive statement of the educational needs of a handicapped child and the specially designed instruction and related services to be employed to meet those needs." School Comm. of Burlington v. Department of Educ. of Mass., 471 U.S. at 368 (citation omitted); see also 20 U.S.C. § 1401. The IDEA requires the IEP to be formulated on an annual basis, developed by "[a] school official qualified in special education, the child's teacher, the child's parents, and, where appropriate, the child." Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 129 (2d

Cir. 1998) (citation omitted); see 20 U.S.C. § 1414(d); Board of Educ. v. O'Shea, 353 F. Supp. 2d at 454.

New York has established regulations implementing the goals of the IDEA, which "appear to track the IDEA closely." Board of Educ. v. O'Shea, 353 F. Supp. 2d at 454; see N.Y. Educ. Law § 4400 et seq. Under New York law, parents who are not satisfied with the proposed IEP may request an impartial hearing before a hearing officer. See N.Y. Educ. Law § 4404(1). Both New York and federal regulations require the hearing officer to render a decision within 45 days of the school board's receipt of a request for a hearing.[27] See N.Y. Comp. Codes R. & Regs. tit. 8 § 200.5(i)(4); see also 34 C.F.R. § 300.511(a); M.B. v. Arlington Cent. Sch. Dist., 2002 WL 389151, at *7 n.4.

The decision of that hearing officer may be appealed to a State Review Officer, whose decision is final and concludes the administrative process. See N.Y. Educ. Law § 4404(2). Once the administrative process is completed, the parents may bring a civil action challenging the decision in federal or state court. See 20 U.S.C. § 1415(i)(2)(A);[28] N.Y. Educ. Law § 4404(3)(a); see also Board of Educ. v. Schutz, 290 F.3d 476, 481 (2d Cir. 2002); Board of Educ. v. O'Shea, 353 F. Supp. 2d at 454. Throughout the hearing and appeal process, the school district "bears the burden of proving by a preponderance of the evidence that: (1) it complied

---

[27]See discussion supra at 18 n.23.

[28]Section 1415(i)(2)(A) provides that any party "aggrieved" by a decision rendered at the administrative level "shall have the right to bring a civil action . . . in a district court of the United States without any regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A); see Mackey v. Board of Educ. for the Arlington Cent. Sch. Dist., 386 F.3d 158, 160 (2d Cir. 2004); M.S. v. Board of Educ. of Yonkers, 231 F.3d at 104-05; Town of Burlington v. Department of Educ., 736 F.2d 773, 791 (1st Cir. 1984), aff'd on other grounds, 471 U.S. 359 (1985); Vultaggio v. Board of Educ., 216 F. Supp. 2d 96, 102 (E.D.N.Y. 2002).

22

with IDEA procedural requirements; and (2) the IEP is "'reasonably calculated" to confer "educational benefits"' on the student." <u>Board of Educ. v. O'Shea</u>, 353 F. Supp. 2d at 454 (citations omitted).

## B. <u>The Parties' Arguments</u>

Plaintiffs seek a modified <u>de novo</u> review of the record and the decisions issued by the state administrative hearing and review officers, pursuant to 20 U.S.C. § 1415(i)(2)(B). They seek reimbursement for the costs of tuition for the Star program and expenses related to the additional ABA services W.B. received. (Mayerson Aff. ¶ 4; Pls.' Reply Mem. at 10).[29] In the alternative, plaintiffs' seek reimbursement for up to 27.5 hours of ABA services pursuant to the pendency entitlements under the IDEA. (Mayerson Aff. ¶ 7; Pls.' Reply Mem. at 11). They contend that both the Hearing Officer and the State Review Officer erred in denying retroactive reimbursement for the parents' placement of W.B. in the Star Institute for the year 2000 - 2001, and for the ABA instruction provided for the child at home.

As an initial matter, defendant does not dispute that W.B.'s parents, by appealing the decision of the Hearing Officer to the State Review Officer, have exhausted their administrative remedies. (<u>See</u> Def's Mem.[30] at 4 (citing 20 U.S.C. § 1415 and quoting <u>Board of Educ. v. Schutz</u>, 290 F.3d at 481 (holding that "'[t]he SRO's decision is final, and concludes the

---

[29]Citations to "Mayerson Aff." refer to the Affidavit of Gary S. Mayerson, Esq., submitted in support of plaintiffs' motion for modified <u>de novo</u> review, dated May 30, 2003. Citations to "Pls.' Reply Mem." refer to Plaintiffs' Reply Memorandum of Law in opposition to defendant's cross-motion for summary judgment, dated Aug. 27, 2003.

[30]Citations to "Def's. Mem." refer to the Defendant's Memorandum of Law submitted in opposition to Plaintiffs' motion for modified <u>de novo</u> review, dated July 14, 2003.

administrative review")); see also Garro v. Conn., 23 F.3d 734, 737 (2d Cir. 1994); Vultaggio v. Board of Educ., 216 F. Supp. 2d at 102-03. Nor does defendant dispute that the parents now have the right, pursuant to 20 U.S.C. § 1415(i)(2)(A), to "'bring a civil action in either federal or state court pursuant to the IDEA.'" (Def's. Mem. at 4 (quoting Board of Educ. v. Schutz, 290 F.3d at 481). Indeed, unlike the majority of cases challenged in federal court, defendant does not dispute that the District's proposed placement of W.B. at P.S. 206 was inappropriate and adopted in violation of the procedural and substantive requirements of the IDEA.

What the parties dispute is the nature and extent of this Court's review of the administrative proceedings and the Court's ability to render equitable relief in the form of retroactive reimbursement, given the administrative findings that the alternative program offered by the parents was also not appropriate for W.B. Defendant contends first, that plaintiffs' motion should be denied because they failed to submit a statement of material facts as required by Local Civil Rule 56.1; and second, that plaintiffs have failed to point to any portion of the record which supports their contention that their program was an appropriate program for W.B. Instead, defendant contends that while plaintiffs are correct that the Hearing Officer used the incorrect standard of review, there is no evidence to suggest that the Review Officer applied the wrong standard, and since his opinion is the one upon which this appeal is based, the Court should afford due deference to the Review Officer's independent findings.

In response, plaintiffs argue that under the IDEA, a motion for modified de novo review is not governed by the same standards as a traditional motion for summary judgment in other contexts. (Pls.' Reply Mem. at 1-2 (citing Wall v. Mattituck-Cutchogue Sch. Dist., 945 F. Supp. 501, 508 (E.D.N.Y. 1996))). Plaintiffs contend that the Court's inquiry is not to discern whether

24

there are material issues of fact in dispute, but rather, whether the administrative record, with "additional evidence," establishes compliance with the IDEA's processes and whether the child's needs have been addressed. (Id.)

Moreover, plaintiffs do challenge the standard of review utilized by the Review Officer, contending that by affirming the local Hearing Officer's attack on the parents for choosing the Star program rather than an ABA based school, the Review Officer implicitly adopted the Hearing Officer's finding that there were alternative ABA based schools available when nothing in the record was offered to support that conclusion. Plaintiffs contend that both the Hearing Officer and the Review Officer committed error by positing what the "best" placement for W.B. would be and held the parents to a higher legal standard than the District.

In addition, plaintiffs criticize the Hearing Officer's and Review Officer's conclusion that the District's failure to provide a 27.5 hour per week training program for W.B. was excused by plaintiffs' failure to press the pendency entitlements. Plaintiffs argue that not only is that contention incorrect because W.B.'s parents expressly demanded that the District implement the pendency entitlements, but they further contend that the pendency entitlements are self-effectuating rights. (Pls.' Mem. at 6 (citing 34 C.F.R. § 300.514(a))); see also Zvi D. v. Ambach, 694 F.2d at 906 (describing the pendency provision of the IDEA as an "automatic preliminary injunction"); Cosgrove v. Board of Educ. of Niskayuna Cent. Sch. Dist., 175 F. Supp. 2d 375, 383-84 (N.D.N.Y. 2001). By criticizing W.B.'s parents for not securing more than nine hours of ABA training for W.B. when the District had failed to provide W.B. with the 27.5 hours a week which was an element of the pendency entitlements, the Review Officer was again holding the parents to a higher standard than the District.

C. Standards for Review

Under Section 1415(i)(2) of the IDEA, "the [d]istrict court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2) (emphasis added). The standard by which a district court reviews the final determination of the State Review Officer has been characterized as "modified de novo review," through the procedural mechanism of summary judgment, but it is treated in substance as an appeal from an administrative decision. See Wall v. Mattituck-Cutchogue Sch. Dist., 945 F. Supp. at 508 (holding that the "inquiry . . . is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with the IDEA's processes and that the child's educational needs have been appropriately addressed"); see also Lillbask v. Connecticut Dep't of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005) (noting that "'[t]hough the parties [in an IDEA action] may call the procedure a "motion for summary judgment". . ., the procedure is in substance an appeal from an administrative determination, not a summary judgment'") (quoting Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 892 (9th Cir. 1995)).[31]

Due to the nature of the Court's inquiry, the "role of the reviewing court . . .is circumscribed," Muller v. East Islip Union Free Sch. Dist., 145 F.3d 95, 101 (2d Cir. 1998), and the court is required to give "'due weight' to [the administrative] proceedings, mindful that the

---

[31]The courts are clear that an IDEA action is different from an ordinary motion for summary judgment in that the existence of a disputed issue of fact will not defeat the motion. See J.R. v. Board of Educ. of Rye Sch. Dist., 345 F. Supp. 2d 386, 394 (S.D.N.Y. 2004). For this reason, because the motion is not a typical motion for summary judgment, the Court declines to dismiss the parents' motion simply because they failed to submit a statement of material facts in dispute pursuant to Local Civil Rule 56.1.

judiciary generally 'lack[s] the "specialized knowledge and experience" necessary to resolve "persistent and difficult questions of educational policy."'" Walczak v. Florida Union Free Sch. Dist., 142 F.3d at 129 (quoting Board of Educ. v. Rowley, 458 U.S. 176, 206, 208 (1982)); see also Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 (2d Cir. 2003); Briggs v. Board of Educ., 882 F.2d 688, 693 (2d Cir. 1989) (holding that deference is required because "State and Local agencies hav[e] expertise in the formulation of educational programs for the handicapped"). In reviewing the administrative record, the court should "avoid imposing [its] view of preferable educational methods upon the states because the 'preponderance of the evidence' provision is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which [it] reviews." Mr. X v. New York State Educ. Dep't, 975 F. Supp. at 555 (quoting Karl v. Board of Educ. of Geneseo Cent. Sch. Dist., 736 F.2d 873, 876-77 (2d Cir. 1984)); see also Board of Educ. v. Rowley, 458 U.S. at 207; Arlington Cent. Sch. Dist. v. D.K., No. 02 CV 2117, 2002 WL 31521158, at *7 (S.D.N.Y. Nov. 14, 2002).

On the other hand, the court "does not use the substantial evidence standard typically applied in the review of administrative agency decisions, 'but instead must decide independently whether the requirements of the IDEA are met.'" Murray v. Montrose County Sch. Dist., 51 F.3d 921, 927 (10th Cir. 1993) (citation omitted); see also Board of Educ. v. Rowley, 458 U.S. at 205 (expressly rejecting the substantive evidence standard of traditional administrative review and adopting the statutorily imposed preponderance of the evidence standard in 20 U.S.C. § 1415); Wall v. Mattituck-Cutchogue Sch. Dist., 945 F. Supp. at 508. In conducting this review, the court may reject factual findings that are not supported by the record or are controverted by the

27

record. See Evans v. Board of Educ. of Rhinebeck Cmty. Sch. Dist., 930 F. Supp. 83, 98 (S.D.N.Y. 1996); see also Mr. X v. New York State Educ. Dep't, 975 F. Supp. at 558. Indeed, the statute provides that the reviewing court shall review the administrative record, hear additional evidence if requested, and "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B)(iii); see also Sherman v. Mamaroneck Union Free Sch. Dist., 340 F.3d 87, 93 (2d Cir. 2003) (holding that the court must decide the case based on "the 'preponderance of the evidence developed at the administrative proceedings and any further evidence presented by the parties'") (quoting M.S. v. Board of Educ. of Yonkers, 231 F.3d at 102).

Moreover, the legal conclusions of the Hearing Officer and the Review Officer are subject to de novo review and no deference is to be afforded to any conclusions of law relating to the "proper interpretation of the federal statute and its requirements." Lillbask v. Connecticut Dep't of Educ., 397 F.3d at 82 (quoting Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1122 (2d Cir. 1997)); accord Muller v. East Islip Union Free Sch. Dist., 145 F.3d at 101-02; J.B. v. Killingly Bd. of Educ., 990 F. Supp. 57, 67 (D. Conn. 1997). "If the conclusions of the hearing and review officers are 'unsupported by the record as a whole and incorrect as a matter of law, they simply [do] not merit deference.'" Mr. X v. New York State Educ. Dep't, 975 F. Supp. at 558 (quoting Evans v. Board of Educ. of Rhinebeck Cmty. Sch. Dist., 930 F. Supp. at 102).


D. Plaintiffs' Entitlement to Reimbursement for Unilateral Placement

In determining whether plaintiffs are entitled to reimbursement for a unilateral placement of their child, the Supreme Court has established a two pronged test to determine the availability

of tuition reimbursement for special education students: (1) was the IEP proposed by the District inappropriate; and (2) were the services supplied by the parents appropriate under the IDEA. See School Comm. of Burlington v. Department of Educ. of Mass., 471 U.S. at 369-70; see also Florence County Sch. Dist. Four v. Carter, 510 U.S. at 12-14. Once the first two factors have been met, the court may determine whether there are any equitable considerations that support the parents' claim, and order "appropriate" relief pursuant to 20 U.S.C. § 1415(i)(2). See Florence County Sch. Dist. Four v. Carter, 510 U.S. at 16 (holding that "[c]ourts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required"); see also School Comm. of Burlington v. Department of Educ. of Mass., 471 U.S. at 369-70 (holding that reimbursement is "'appropriate' [relief] in light of the purpose of the Act" and that "'appropriate' relief would include a prospective injunction directing the school officials to develop and implement at public expense an IEP placing the child in a private school"); Still v. DeBuono, 101 F.3d at 891 (holding that "appropriate" relief includes "the authority to order reimbursement for expenditures made to obtain appropriate educational services"). However, "[t]otal reimbursement will not be appropriate if the court determines that the cost of the private education was unreasonable." Florence County Sch. Dist. Four v. Carter, 510 U.S. at 16.

Here, there is no dispute that the placement and services offered by the District were inadequate and inappropriate for W.B.'s needs. Both the Hearing Officer and the Review Officer found serious deficiencies in the program offered by the District to W.B. Not only did the District fail to comply with the procedural requirements of the IDEA in preparing the IEP for W.B., but the IEP that was developed lacked appropriate goals and an appropriate behavioral

29

plan for W.B. (Hrg. Officer's Findings at 18). Indeed, in this action, defendant concedes that the first prong of the Burlington/Carter test has been satisfied. (Def's. Mem. at 6). The only issue is whether the program obtained by the parents was appropriate.

Plaintiffs contend that there was "ample" evidence in the record that the Star component of W.B.'s educational program was appropriate in that it was designed specifically to address the needs of children with PPD(NOS), which was W.B.'s diagnosis, and that the Star class consisted of only nine children, similar to W.B., with three staff members. (Pls.' Mem. at 14). Plaintiffs also point to the evidence in the record that although initially obstinate, W.B. had become "much better at transitioning," and with "modeling" had progressed in the program. (Id.) Moreover, although defendants contend that W.B. made "limited to no progress in the Star program" (Def's. Mem. at 7), plaintiffs argue that the Star program representative's testimony regarding W.B.'s improved transitioning is a "highly significant" advancement for a child like W.B. because, as the statutory regulations recognize, "children with autism generally have great difficulty surmounting changes and transitions in their environment." (Pls.' Reply Mem. at 8 (citing 34 C.F.R. § 300.5(b)(1))). Finally, plaintiffs contend that because the program continued through August, it provided needed consistency for W.B. (Pls.' Mem. at 14).

Plaintiffs argue that, in reviewing the parents' program and concluding that it was inappropriate, both the Hearing Officer and the Review Officer applied a standard higher than what the District was held to in reviewing the IEP. Plaintiffs take the position that since the school district is not required to provide the "best" educational program, but merely one that is "likely to produce progress, not regression," parents of children should not be held to a higher standard than the school district. (Pls.' Reply Mem. at 6 (quoting Walczak v. Florida Union Free

30

E. Standards for Determining "Appropriate"

The courts have developed a test for determining whether the school authorities have formulated an "appropriate" IEP under the IDEA: (1) "has the State complied with the procedural requirements set forth in the Act?" and (2) "is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" Evans v. Board of Educ. of Rhinebeck Cmty. Sch. Dist., 930 F. Supp. at 93 (quoting Board of Educ. v. Rowley, 458 U.S. at 206-07); see also Antonaccio v. Board of Educ. of Arlington Cent. Sch. Dist., 281 F. Supp. 2d 710, 724 (S.D.N.Y. 2003); Manuel R. v. Ambach, 635 F. Supp. 791, 793-94 (E.D.N.Y. 1986). While the Supreme Court has "rejected a potential maximizing standard of what is 'appropriate' education for a child, the Court noted that '[t]he Act's use of the word 'appropriate' [] seems to reflect Congress' recognition that some settings simply are not suitable environments for the participation of some handicapped children.'" Mrs. B v. Milford Bd. of Educ., 103 F.3d at 1122 (quoting Board of Educ. v. Rowley, 458 U.S. at 189).

Although there are fewer cases addressing the standard to be applied in evaluating the parents' placement, it appears as if the standard is the same as that applied to the school authorities. See M.S. v. Board of Educ. of Yonkers, 231 F.3d at 104 (determining whether "the private education services obtained by the parents were appropriate to the child's needs") (quoting Walczak v. Florida Union Free Sch. Dist., 142 F.3d at 129). "[T]o determine the appropriateness of parental placement, courts must apply the Rowley standard, that is, whether

31

the private placement is 'reasonably calculated to enable the child to receive educational benefit.'" Briere v. Fair Haven Grade Sch. Dist., 948 F. Supp. 1242, 1257 (D. Ver. 1996) (quoting Board of Educ. v. Rowley, 458 U.S. at 207); accord Searles v. Board of Educ. of the Ellenville Cent. Sch. Dist., No. 96 CV 0637, 97 CV 0572, 1999 WL 34983, at *3 (N.D.N.Y. Jan. 13, 1999).

Indeed, if anything, the standard applied to determine the appropriateness of parental placements is less restrictive and subject to fewer constraints than that applied to the school authorities. Specifically, the Supreme Court has held that parents are not barred from reimbursement because the private school they chose for their child "did not meet the 1401(a)(18) definition of a 'free appropriate public education'" or for its failure to meet state education standards. Florence County Sch. Dist. Four v. Carter, 510 U.S. at 13-14. While a child's "education [should] be in the mainstream to the extent possible," the Second Circuit has also recognized that parents "may not be subject to the same main-streaming requirements as a school board." M.S. v. Board of Educ. of Yonkers, 231 F.3d at 105 (citing Warren G. v. Cumberland County Sch. Dist., 190 F.3d 80, 84 (3d Cir. 1999) (holding that "[t]he test for the parents' private placement is that it is appropriate, and not that it is perfect")). This may, however, be a factor that is considered in determining whether or not a placement is appropriate. M.S. v. Board of Educ. of Yonkers, 231 F.3d at 105. Furthermore, at least one court has held that a "private school need not . . . have its own IEP for the student." Werner v. Clarkstown, 363 F. Supp. 2d 656, 660 (S.D.N.Y. 2005).

Defendant has not cited, nor has this Court found, any authority that suggests that the parents are to be held to a higher standard and are required to find more than an "appropriate"

32

program for their child that "will be reasonably calculated to enable the child to receive educational benefits." Evans v. Board of Educ. of Rhinebeck Cmty. Sch. Dist., 930 F. Supp. at 93. Thus, this Court finds that the relevant test is whether or not the Star program was appropriate to W.B.'s needs. The Court further finds that the same considerations and criteria that apply in determining whether the school district's placement is appropriate should be considered in determining the appropriateness of the parents' placement; the parents should not be held to a higher standard than the school district.

Under the IDEA, an appropriate educational program is one that is "'likely to produce progress, not regression.'" M.S. v. Board of Educ. of Yonkers, 231 F.3d at 104 (quoting Walczak v. Florida Union Free Sch. Dist., 142 F.3d at 130). It must be a program "reasonably calculated to provide some 'meaningful' benefit." Mrs. B. v. Milford Bd. of Educ., 103 F.3d at 1120 (quoting Board of Educ. v. Rowley, 458 U.S. at 192). This standard requires "more than 'mere trivial advancement,'" id. at 1121 (quoting Polk v. Cent. Susquehanna Intermediate Unit 16, 853 F.2d 171, 183 (3d Cir. 1988)), but at the same time, the child's progress "must be viewed in light of the limitations imposed by the child's disability." Id. (citing Board of Educ. v. Rowley, 458 U.S. at 202). As the Court in Rowley recognized, "[i]t is clear that the benefits obtainable by children at one end of the spectrum will differ dramatically from those obtainable by children at the other end, with infinite variations in between." Board of Educ. v. Rowley, 458 U.S. at 202. The IDEA "cannot guarantee totally successful results," Walczak v. Florida Union Free Sch. Dist., 142 F.3d at 133, and the standard of "appropriate" does not require that the program provided maximize the potential of the handicapped child. See Board of Educ. v. Rowley, 458 U.S. at 189; see also Evans v. Board of Educ. of Rhinebeck Cmty. Sch. Dist., 930 F. Supp. at 101

33

n. 4 (noting that "[t]he fact that [a child] makes good progress at [a school] is merely an indication that that type of program was appropriate and effective" but that the court must be "mindful of the fact that a district court is not to decide which program offers the greatest benefits to a child, but whether the program offered to the child . . . enables him to receive educational benefits").

In the context of evaluating the school authorities' proposed IEP, numerous courts have held that the determination of appropriateness "is necessarily prospective in nature; we therefore must not engage in Monday-morning quarterbacking guided by our knowledge of [the child's] subsequent progress. . . but rather consider the propriety of the [program] with respect to the likelihood that it would benefit [the child] at the time it was devised." J.R. v. Board of Educ. of Rye Sch. Dist., 345 F. Supp. 2d at 395 (noting that the Second Circuit had not yet addressed the question, but holding that the propriety of an IEP is evaluated prospectively "at the time it was devised"); see also Antonaccio v. Board of Educ. of Arlington Cent. Sch. Dist., 281 F. Supp. 2d at 724 (finding that the Hearing Officer and the State Review Officer had erred in "regarding any information about [the student's] education after [the date the IEP was devised]," and noting that "[t]hough the Second Circuit has not addressed this precise issue, other courts have found that 'appropriateness is judged prospectively so that any lack of progress under a particular IEP, assuming [] that there was no progress, does not render that IEP inappropriate'") (citing Carlisle Area Sch. v. Scott P., 62 F.3d 520, 523 (3d Cir. 1995); Roland M. v. Concord Sch. Comm., 910 F.2d 983, 992 (1st Cir. 1990), cert. denied, 499 U.S. 912 (1991); Board of Educ. of Kanawha v. Michael M., 95 F. Supp. 2d 600, 609 (S.D. W. Va. 2000)). The Ninth Circuit has stated:

> Instead of asking whether the [program] was adequate in light of
> the [child's] progress, the district court should have asked the more

> pertinent question of whether the [program] was appropriately
> designed and implemented so as to convey . . .a meaningful
> benefit. We do not judge [a program] in hindsight; rather we look
> to the [program's] goals and goal achieving methods at the time the
> plan was implemented and ask whether these methods were
> reasonably calculated to confer . . .a meaningful benefit.

Adams v. Oregon, 195 F.3d 1141, 1149 (9th Cir. 1999); see also Fuhrmann v. East Hanover Bd.

of Educ., 993 F.2d 1031, 1041 (3d Cir. 1993) (noting that an IEP "is a snapshot, not a

retrospective. In striving for 'appropriateness,' an IEP must take into account what was, and was

not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was

drafted") (citations omitted).

     While these cases were evaluating the appropriateness of the school's IEP, this Court sees

no reason why the parents' choice of a program should not be evaluated under the same

standards, looking at the program at the time that the parents selected it and determining whether,

at that point, it was a program reasonably calculated to provide the child with an educational

benefit. Indeed, if the child's lack of progress under a particular IEP does not render the IEP

inappropriate, see Antonaccio v. Board of Educ. of Arlington Cent. Sch. Dist., 281 F. Supp. 2d at

724, the fact that the child may not have progressed under the parents' chosen program should

not automatically mean that the program was inappropriate at the time the placement decision

was made. If anything, it would be expected that the school authorities, with their many trained

personnel, resources, and access to information, would be in a better position than the average

parent in determining what an appropriate educational program would be for a child.


F. Application

     Based on the evidence in the record, the Court finds that both the Hearing Officer and the

State Review Officer applied the wrong standards in evaluating the parents' program. In finding the parents' program to be inappropriate, both the Hearing Officer and the State Review Officer relied on "after-the-fact evidence," see id., reviewing the Star program and the ABA provided by the parents retroactively in terms of the progress made by W.B. They did not make a determination as to whether the parents' program, at the time the placement decision was made, was one that was "reasonably calculated to enable the child to receive educational benefits." Mrs. B. v. Milford Bd. of Educ., 103 F.3d at 1120 (citation omitted). Instead, they held the parents' program to a standard higher than that applied to the District. The State Review Officer and Hearing Officer also ignored evidence in the record and drew conclusions as to the propriety and availability of alternative programs, for which there was no evidence in the record.

The Hearing Officer clearly erred in employing a "clear and convincing" evidentiary standard in evaluating the program devised by W.B.'s parents. While the State Review Officer correctly found that evidentiary standard to be improper, nevertheless, his decision makes it clear that he also applied the wrong standard of review in evaluating the appropriateness of the parents' placement.[32] He did not consider whether, at the time the decision was made in June 2000, the parents' selection of the Star program was "reasonably calculated to provide some 'meaningful benefit' [to W.B.]." Id. Instead, he looked at W.B.'s status and the progress made by W.B. after he had been in the Star program for only a few months, relying heavily on the

---

[32]The State Review Officer applied a "substantial evidence" standard in reviewing the Hearing Officer's findings. This Court has previously noted the "paradoxical nature of federal district court review of IDEA cases," where New York State law has applied a "substantial evidence rule" which "is a far cry from the independent preponderance of the evidence judicial review explicitly provided for by IDEA." Wall v. Mattituck-Cutchogue Sch. Dist., 945 F. Supp. at 508 n.8) (questioning, but not deciding, whether the state's standard of review would be pre-empted by the Supremacy Clause).

reports that W.B.'s "oppositional and defiant behaviors at home and in school had increased while he was attending the Star Program and receiving only nine hours of ABA instruction at home." (SRO Decision at 5). He noted that the "the child was resistant in the classroom," "had difficulty sustaining attention when he was not in a 1:1 setting," and exhibited "negative behaviors." (Id.) Based on the description of W.B.'s performance in the Star program, the State Review Officer held: "I am unable to find that the Star program met the student's special education needs." (Id.) This determination by the State Review Officer is clearly not a "prospective" evaluation of the parents' proposed program, looking at it at the time the child was originally placed there, "with respect to the likelihood that it would benefit [the child] at the time it was devised," but rather is the quintessential "Monday-morning quarter backing guided by . . . knowledge of [the child's] subsequent progress. . . ," J.R. v. Board of Educ. of Rye Sch. Dist., 345 F. Supp. 2d at 395, that courts have criticized.

Furthermore, the State Review Officer improperly shifted the burden to the parents to explain why the home component of ABA was a necessary educational methodology even though experts in the field, including the Hearing Officer, had previously reached the conclusion that home ABA was needed. (See SRO Decision at 5; see also Hrg. Officer's Findings at 19). The State Review Officer also shifted to the parents the burden of developing a behavioral modification plan for W.B., unfairly criticizing the Star program for not formulating a behavioral intervention plan with specific behavioral strategies to address W.B.'s negative behaviors (see SRO Decision at 5-6), when the responsibility for devising such a program lay with the District, and not with the parents or the private school. (See Hrg. Officer's Findings at 18 (explaining that it is the "CSE's responsibility to prepare a behavioral modification plan as a component of the

37

child's IEP"); see also 34 C.F.R. § 300.346 (a)(2)(i) (stating that: "In the case of a child whose behavior impedes his or her learning or that of others, [the IEP team shall] consider, if appropriate, strategies, including positive behavioral interventions, strategies, and supports to address that behavior"); 34 C.F.R. § 300.347 (outlining the details necessary for an appropriate IEP); Werner v. Clarkstown, 363 F. Supp. 2d at 660 (holding that a "private school need not . . . have its own IEP for the student").

Moreover, in finding that the program developed by the parents was not appropriate, the State Review Officer concluded that "there is no evidence in the record demonstrating that the child benefitted from the program his parents obtained." (SRO Decision at 6). The fact that a child makes no progress under the IEP developed by the school authorities has been held not to be sufficient to "render the IEP inappropriate." Antonaccio v. Board of Educ. of Arlington Cent. Sch. Dist., 281 F. Supp. 2d at 724. The State Review Officer, by requiring the parents to show that the child made progress, erred in holding the parents to a higher standard than that which would be imposed on a school board.

Thus, the Court finds that, in basing his evaluation on a retroactive review of the progress made by W.B. while in the Star program, rather than determining whether at the time of W.B.'s placement in the Star program there was a likelihood that it would benefit him, the State Review Officer, as a matter of law, applied an inappropriate standard of review under the IDEA, and that his resulting conclusion was in error.

Indeed, an independent review of the record before this Court demonstrates that had the State Review Officer employed the proper standard of prospective evaluation, there would have been more than a preponderance of the evidence to support the conclusion that the Star program

38

was an appropriate placement for W.B. The record reveals a wealth of information about the Star program demonstrating that it was a program specifically designed to deal with children like W.B. and which offered numerous and varied strategies for addressing W.B.'s weaknesses.

The State Review Officer in his opinion details some of W.B.'s "significant deficits in the areas of socialization, language, attention and focusing," as well as W.B.'s need for a "structured environment" and "behavioral interventions." (SRO Decision at 6). Although he states that there was "little information in the record demonstrating how the STAR program would address the child's weaknesses" (id.), this assertion is completely contrary to the evidence in the record. Jeanne Angus testified that the Star program was specifically designed to serve students like W.B. who have been diagnosed with PDD(NOS) (Tr. VI at 534-35), and the Star Curriculum that is detailed in the record lists and describes a number of goals, activities, and projects for W.B.'s class that deal with cognitive skills, communication skills, language skills, and mathematics skills, many of the areas of concern for W.B. (Hrg. Rec., Ex. 23-8, 23-9, 23-10, 23-11, 23-12). While the State Review Officer did not appear to consider the Star Curriculum, the State Review Officer did concede that there was testimony by Jeanne Angus, the supervisor of the Star program, about the various goals and strategies used to address W.B.'s weaknesses. (SRO Decision at 6; see also Tr. VI at 534, 538, 539, 543-544, 546, 547, 548, 569, 586-87).

Among other things, Ms. Angus testified that the Star program groups children according to age and ability, with a focus on the development of "independent skills." (Tr. VI at 538). She also testified that the program "stressed the use of language and attentiveness." (SRO Decision at 6; Tr. VI at 538). All of these were areas of weakness exhibited by W.B. (SRO Decision at 6). Moreover, Ms. Angus explained how the small class size and the teacher-student ratio were more

39

appropriate to a child like W.B. who is easily distractible, even with the aid of a one-on-one

paraprofessional. (Tr. VI at 545). Ms. Strazzeri, W.B.'s ABA instructor, noted that the small

class size of nine students and three adults at Star provided W.B. with "a lot more"

individualized attention,[33] and that W.B. was able to follow the routines in the classroom without

the need for one-on-one supervision.[34] (Tr. V at 383). Ms. Strazzeri also commented that it is

"extremely important" to have consistency when working with children with autism, and she

described the benefit to W.B. of the "very high level" of structure that she observed in the Star

classroom: "[t]he children had a specific routine that was happening in the classroom. A

schedule. . . .It was consistent." (Id. at 410).

In addition to the fact that the Star program offered the structure and consistency needed

by W.B., as well as the benefit of a smaller classroom which increased his attentiveness and

focus, Ms. Angus testified that the Star program seeks to encourage "initiating interactions and

responsiveness," which she explained was taught through a hand over hand approach, by

modeling responses, by guiding and monitoring, and constant reinforcement of appropriate

behavior. (Tr. VI at 543-44, 575-76). She also testified that the "cognitive behavioral

approaches" used at the Star program apply techniques similar to the ABA approach in terms of

"redirecting the student" and "reinforcing the student's appropriate behavior." (Id. at 578).   She

described how the Star program integrates parents into the program so that they can be involved

---

[33]As the court in Board of Educ. v. Gustafson, noted: "[t]he gains from smaller class size or greater personal attention are difficult to measure." No. 00 CV 7870, 2002 WL 313798, at *7 (S.D.N.Y. Feb. 27, 2002).

[34]Had W.B. required one-on-one supervision, it would appear that at least one child in the Star program was allowed to have an individualized paraprofessional assigned in the classroom. (Tr. VI at 538-39; see discussion supra at 14).

in "doing the same work that we are doing in the classroom as a carry over." (Id. at 540). She

further described how W.B.'s teachers in the Star program would use music and song to improve

W.B.'s communications skills. (Id. at 569).

Thus, it is clear from the evidence in the record that at the time the parents were

considering the Star program, it offered many of the things that the parents had been told W.B.

needed - - consistency, structure, a focus on language and socialization skills, and a small

program which would allow W.B. to become more independent.[35] There was also evidence,

apparently ignored by both the Hearing Officer and the State Review Officer, that at least one of

the psychologists consulted by the parents, Dr. Cecilia McCarton, specifically recommended the

Star program for W.B. for the 2000 school year.[36] (Tr. II at 63). This is especially notable

because Dr. McCarton's prior recommendation for the 1999 school year was that W.B. be placed

in a 12 month program and be provided with 40 hours of ABA per week, with 15 hours of ABA

therapy in a center-based special education school and 25 hours of at home ABA therapy. (Hrg.

Rec. at 5-3).

Moreover, contrary to the State Review Officer's finding that there was no evidence that

W.B. had benefitted from the Star program, the record includes testimony from both parents,

from Ms. Angus, and from Ms. Strazzeri that indicates W.B. had experienced benefit from the

---

[35]In addition, this Court notes that W.B.'s parents believed that since the Star program is affiliated with YAI, the provider of W.B.'s SEIT/ABA services, they were proposing a solution to the problem of W.B.'s placement that would be satisfactory to the District. (See Tr. VI at 485; see also Tr. I at 8; Tr. IV at 250; Tr. V at 375; Hrg. Rec. Exs. 23-1, 23-4, 23-5, 23-6).

[36]It is worth noting that none of the witnesses who testified at the impartial hearing suggested that the Star program was inappropriate for W.B. Indeed, none of the District's witnesses, apart from Ms. Tuchfeld, had ever observed a class at Star, and Ms. Tuchfeld's testimony was precluded because of her failure to comply with the notice requirements prior to her visit.

program. Ms. Strazzeri specifically testified that W.B. had become more independent at Star, able to function without the need for one-on-one supervision, was able to follow routines with "a simple verbal command" (Tr. V at 383), was very comfortable and happy, and that he was "get[ting] along with his peers and teachers [in the classroom]." (Id. at 384). While Ms. Angus admitted that W.B. had not made as much progress as she had hoped in the five months he had been in the Star program (Tr. VI at 548), she testified that he had made significant improvements in his ability to transition and to act independently. (Id. at 542, 557). She also testified that W.B. had made improvements in language, albeit slowly. (Id. at 570-72).

The State Review Officer's determination that the Star program was not "appropriate" for W.B. is also at odds with what the Hearing Officer had found appropriate based on the same record. Although the State Review Officer correctly found that the Hearing Officer had erred in applying a clear and convincing standard to find that the parents' program was inappropriate, the State Review Officer ignored the Hearing Officer's finding, by "clear and convincing evidence,"[37] that the Star program was "more appropriate" for W.B. than the program at P.S. 206 offered by the District. The Hearing Officer's assessment of the Star Program was based on New York's requirement, pursuant to N.Y. Comp. Codes R. & Regs. tit. 8 § 200.6(a)(3), that a child with disabilities be grouped "by similarity of the individual needs according to four criteria: academics, social development, physical development and management needs." (Hrg. Officer's Findings at 18). Based on her review of the record, the Hearing Officer explicitly found that the

---

[37]It is clear, and the State Review Officer so found, that the Hearing Officer's application of a "clear and convincing" standard was inappropriate under the IDEA. (SRO Decision at 5; see discussion supra at 19, 36). However, it is curious that the State Review Officer, allegedly applying a less stringent standard, nonetheless found that the Star program was not appropriate because it failed to address W.B.'s needs.

Star program had a number of advantages over the program provided by the District, including the smaller class size, the better teacher-student ratio, the grouping of W.B. with students of similar individual needs and abilities, and the fact that the Star program provided a twelve month program which W.B. required instead of the ten month program proposed by the District. (Id. at 18-19). In fact, the Hearing Officer concluded that "[W.B.] benefitted from being placed in a class that is grouped by similarity of the individual needs."[38] (Id. at 20).

The Hearing Officer had no specific criticism of the Star program; indeed, the only deficiency cited by the Hearing Officer with respect to the parents' program was their failure to obtain more than nine hours of at home ABA services. Although the State Review Officer agreed with the Hearing Officer that the at home ABA services provided by the parents were insufficient, he seemingly contradicted that finding by stating that there was no information in the record explaining how the increased at home ABA hours would affect W.B.'s behavior at school.

Again, a review of the record demonstrates that there was testimony explaining the value of ABA instruction at home and how that affected W.B.'s ability to deal with negative behaviors in school. Jennifer Strazzeri, W.B.'s ABA teacher, testified that the at home ABA therapy focused on "things that he might be working on in school to keep him consistent with school." (Tr. V at 380). Reinforcement of behaviors learned in school, "consistency" in dealing with an

---

[38]This Court notes that neither the Hearing Officer nor the State Review Officer found the parents' program to be inappropriate based on the "least restrictive environment" preference of the IDEA. In fact, the Hearing Officer specifically recommended that the CSE consider that a more appropriate placement for W.B. should include a smaller staff-to-student ratio and a "class that is grouped by similarity of the individual needs." (Hrg. Officer's Findings at 19-20). Since the State Review Officer affirmed the Hearing Officer's determination that the District's general education integrated program was inappropriate (SRO's Decision at 4), and implicitly adopted the Hearing Officer's order to the CSE to find an appropriate placement in compliance with her recommendation, this Court defers to the Hearing Officer's findings of what would constitute a more appropriate placement.

autistic child, was one of the things Ms. Strazzeri focused on in her analysis. (Id. at 410). She testified that part of the ABA therapy was teaching the family how to "deal with him more appropriately." (Id. at 387). She testified that W.B. needed more than nine hours of at home ABA therapy (id. at 387-88), and that given more time, the at home ABA would provide more structure and consistency to reinforce appropriate behaviors. (Id. at 408-10). In addition, Ms. Angus testified that at home ABA would be used to facilitate more "one-to-one concentration without other children," and that it was for "processing and receptive language and self initiation." (Tr. VI at 564). Moreover, the at home ABA would serve as an "early intervention," which Ms. Angus explained would make "neurological differences and improvements." (Id. at 564-65). Ms. Strazzeri's and Ms. Angus' testimony about the consistency and structure provided by the at home ABA therapy certainly respond to the State Review Officer's concern about how the therapy would address W.B.'s behaviors at school.

Affording all due deference to the expertise of the Hearing Officer, the Court does not dispute her finding that W.B. needed more than nine hours of ABA. However, it is clear from the record that although more hours of ABA therapy would have been ideal and were recommended by the parents' witnesses as well, there was testimony that the parents could not afford the additional hours. The District's failure to comply with the pendency order mandating that W.B. be provided with 27.5 hours of ABA and that the District provide compensation for such services should not be the basis for a finding that the parents failed to provide an appropriate program.[39] See Mackey v. Board of Educ. for the Arlington Cent. Sch. Dist., 386 F.3d at 162 (noting that "'implicit in the maintenance of the status quo is the requirement that a school district continue to

---

[39] See discussion supra at 5 n.11, 17-20.

44

finance an educational placement made by the agency and consented to by the parent before the parent requested a due process hearing'") (quoting Zvi D. v. Ambach, 694 F.2d at 906). To require that the parents provide more ABA therapy and deny their request for reimbursement for the program they did provide, especially when such hours had already been ordered but the District had refused reimbursement, would be inequitably requiring the parents to maximize W.B.'s potential. See Connors v. Mills, 34 F. Supp. 2d 795, 805 (N.D.N.Y. 1998) (holding that "[w]ithout interim financial support, a parent's 'choice' to have his child remain in what the state has determined to be an appropriate private school placement amounts to no choice at all. The prospect of reimbursement at the end of the litigation turnpike is of little consideration to a parent who cannot pay the toll at the outset") (quoting Susquenita Sch. Dist. v. Raelee, 96 F.3d 78, 86-87 (3d Cir. 1996)).

The Hearing Officer also rejected the parents' argument that what would have been appropriate was the Star program with 27.5 hours of SEIT/ABA training[40] - - the amount of training established by the pendency entitlements. Instead, she concluded that such a program would have been too burdensome for W.B. and that "the parents could have chosen one of a number of available integrated ABA/academic programs." (Hrg. Officer's Findings at 19).

The Court does not take issue with the Hearing Officer's judgment that an ABA based school program, coupled with ABA reinforcement training at home, would have presented the ideal combination of features for W.B. In making this finding, the Court has given all due deference to the educational expertise of the Hearing Officer and the Review Officer.[41] However,

---

[40]But see discussion supra at 10 n.16.

[41]In this regard, the record contains contrary evidence suggesting that W.B. did not need an integrated ABA program. Ms. Strazzeri clearly and unequivocally testified that W.B. had

by finding the parents' program to be inappropriate because they did not obtain an integrated ABA program, the Hearing Officer and the Review Officer assumed that such a program existed and that there was space available for W.B. in such a program.

The IDEA does not require the parents to provide an "ideal program," just an "appropriate" one. Here, there is no evidence in the record that the program envisioned by either the Hearing Officer or the State Review Officer even existed that would provide W.B. with an ABA based school program of appropriate size and structure. See Briere v. Fair Haven Grade Sch. Dist., 948 F. Supp. at 1257 (approving the parents' placement where the district failed to offer any alternative program, and noting that although the IDEA requires the placement of a child in the least restrictive alternative setting, application of this principle "presupposes that there are alternatives from which to choose"); cf., Adams v. Oregon, 195 F.3d at 1151 (remanding parents' request for reimbursement for further findings as to the existence of other, perhaps more appropriate substitute placements for the child). Although the Hearing Officer criticized the parents for not placing W.B. in such a program, the record is devoid of any evidence that such a program existed or if it had existed whether there was space for W.B. in such a program. The parents testified that the year before the one in question, they had made efforts to obtain placement for W.B. in other programs only to be told that there was no space available and that they would be placed on a waiting list. (Tr. VI at 502; see also discussion supra at 7).

Indeed, had such a program existed with available space for W.B., it is unclear why the

---

never had ABA instruction while in school since SEIT shadowing is distinct from ABA therapy (Tr. V at 394, 412), and that, in the context of the Star program, W.B. did not need a SEIT in school with him. (Id. at 412). Nevertheless, despite this evidence, the Court accepts the findings of the Hearing Officer that such a program would have been best for W.B.

defendant District did not provide that information to W.B.'s parents, to the Hearing Officer, or to this Court. The IDEA places that responsibility on the District. "When placements in conventional public institutions are unavailable or inappropriate, the state must place the child in private institutions and ensure that such placements occur 'at no cost to their parents. . . .'" Vander Malle v. Ambach, 667 F. Supp. 1015, 1027 (S.D.N.Y. 1987) (quoting 20 U.S.C. § 1413(a)(4)(B)(i)). Surely, had such a program been available, defendants would have placed W.B. in that program rather than in the utterly inappropriate program proposed at P.S. 206. At the very least, defendants could have presented evidence of this alternative program at any stage during these proceedings, but they did not.

In the absence of any evidence of a viable alternative, the Court finds, based on a review of the record, that the parents did the best they could to find an appropriate program for W.B., which, in this case, was a program, although not ABA focused, that was nonetheless found by the Hearing Officer to be "more appropriate" in several ways than the alternative offered by the District. With an autistic child of W.B.'s age, where there are no grades or test scores, it is difficult to find "objective evidence indicating whether the child is likely to make progress or regress under the proposed plan." Walczak v. Florida Union Free Sch. Dist., 142 F.3d at 130. Other than the recommendation of Dr. McCarton, and the advice and the information they had received from professionals and the personnel at Star, there was no other way for W.B.'s parents to gauge whether W.B. would progress in this program. However, the IDEA does not require the student to "receive a great education in his public school" nor does it require the IEP to address his disabilities "in the best way possible." M.B. v. Arlington Cent. Sch. Dist., 2002 W.L. 389151, at *9. Similarly, the parents were not required to provide the "best possible" education for W.B.

47

in order to receive reimbursement when the District had utterly failed to comply with the Act or its financial responsibilities under the prior pendency order.

The Hearing Officer's and the State Review Officer's conclusion that the parents' program was not appropriate was based on an erroneous application of the legal standard and is not supported by a preponderance of the evidence. By looking to the progress and the benefits or lack thereof experienced by W.B., instead of determining whether the program was reasonably designed to provide W.B. with a meaningful educational benefit, the State Review Officer was holding the parents to a higher standard than that applied to the school authorities. Moreover, in evaluating the Star program, the State Review Officer overlooked significant evidence, namely, the Star Curriculum, and undervalued other evidence, namely, the gains from smaller class size and greater personal attention, which are difficult to measure. See Board of Educ. v. Gustafson, 2002 WL 313798, at *7. It may not have been the perfect program for W.B.; an integrated ABA program with a smaller class size and peers grouped by similarity of individual needs, had it existed, might have proven more successful. But see Walczak v. Florida Union Free Sch. Dist., 142 F.3d at 133 (holding that the IDEA "cannot guarantee totally successful results") (citing Board of Educ. v. Rowley, 458 U.S. at 189 (noting that "[i]ndeed, Congress expressly 'recognize[d] that in many instances the process of providing special education and related services to handicapped children is not guaranteed to produce any particular outcome'") (quoting S.Rep. No. 94-168, at 11 (1975), reprinted in 1975 U.S. Code Cong. & Admin. News 1425, 1435)). However, the evidence is clear that when faced with no viable alternative, the parents' placement of W.B. in the Star program was certainly appropriate given the Board's failure to provide W.B. a free and appropriate education.

When, as here, "the parents are ultimately successful in the review proceedings, the IDEA permits the retroactive recovery of any tuition expenses." Board of Educ. v. Schutz, 290 F.3d at 481 (citing School Comm. of Burlington v. Department of Educ. of Mass., 471 U.S. at 372). Furthermore, "reviewing courts are empowered to 'grant such relief as the court determines is appropriate,'" see 20 U.S.C. § 1415(i)(2) (1997), and "the reviewing court's authority to order 'appropriate' relief, . . .includes the authority to order reimbursement for expenditures made to obtain appropriate educational services." Still v. DeBuono, 101 F.3d at 891; see also School Comm. of Burlington v. Department of Educ. of Mass., 471 U.S. at 372 (holding that "[r]eimbursement [] requires the [District] to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP" and that "equitable considerations are relevant in fashioning [appropriate] relief"). Accordingly, the Court reverses the findings of the State Review Officer and holds that W.B.'s parents are entitled to recover the cost of the Star program for the year 2000 - 2001 as well as the actual costs for ABA and other related services.[42]

The Court finds that the amount requested for tuition at Star is "reasonable" and that the plaintiffs' request for the costs of providing ABA and other related services is also reasonable. See Florence County Sch. Dist. Four v. Carter, 510 U.S. at 16; cf. St. Johnsbury Academy v. D.H.,

---

[42]This Court notes that a recent case has called into question the jurisdiction of federal courts to hear IDEA claims seeking reimbursement for "related services" for a child in private school. See Gabel v. Board of Educ. of the Hyde Park Cent. Sch. Dist., No. 04 CV 510, 2005 WL 1140556, at *12-16 (S.D.N.Y. May 10, 2005) (holding that the district court has no jurisdiction under federal law to review a decision by an impartial hearing officer concerning "related services"). Since this Court has ordered that the parents be reimbursed for the costs of tuition and related services under the Court's equitable authority to order "appropriate relief" under the IDEA, it is unnecessary to consider the question of federal jurisdiction to review a claim of "related services."

49

240 F.3d 163, 171 (2d Cir. 2001) (holding that where a local educational agency places a child in a private school as a means of complying with the IDEA, "the statute obligates the 'State' – not the private school – to 'ensure' that such children 'are provided special education and related services, in accordance with an individualized education program.") (emphasis added). Indeed, the hearing officer who considered the parents' request for reimbursement of tuition and services for the 1999 to 2000 year explicitly found that 27.5 hours of such services was reasonable and ordered the District to pay for those services during the pendency of the proceedings. In light of that hearing officer's finding of reasonableness, and since "related services" are those "services that enable a disabled child to remain in school during the day [to] provide the student with 'the meaningful access to education that Congress envisioned,'" Cedar Rapids Community Sch. Dist. v. Garret F., 526 U.S. 66, 73 (1999) (quoting Irving Independent Sch. Dist. v. Tatro, 468 U.S. 883, 891 (1984)), this Court concludes that equity demands that, at the very least, plaintiffs should recover the cost of those services to the extent that they actually paid for them.

G. Plaintiffs' Pendency Entitlement

In this action, plaintiffs alternatively seek reimbursement for the costs of ABA and other services they provided to W.B. pursuant to the pendency entitlement established under the prior hearing begun in October 1999 for the 1999-2000 school year and concluded on March 14, 2002. Plaintiffs' claims for reimbursement on a pendency basis are separate and distinct from plaintiffs' claims for reimbursement of tuition and cost of related services based on the unilateral placement of W.B. in the Star program with at home ABA services. See Mackey v. Board of Educ. for the Arlington Cent. Sch. Dist., 386 F.3d at 162 (holding that "[a] claim for tuition reimbursement

50

pursuant to the stay-put provision is evaluated independently from the evaluation of a claim for tuition reimbursement pursuant to the inadequacy of an IEP"); see also Board of Educ. v. O'Shea, 353 F. Supp. 2d at 459 (holding that parents are "entitled to tuition reimbursement on a pendency basis regardless of the merit of their claim [as to the inadequacy of the IEP] because pendency placement and appropriate placement are separate and distinct concepts").

However, because this Court, in exercising its equitable authority, has determined that "appropriate relief" in this case should include reimbursement for the ABA services that plaintiffs paid for during the 2000 school year, there is no reason to review plaintiffs' claim that the Hearing Officer and State Review Officer erred in not awarding that same relief pursuant to the earlier hearing officer's pendency placement.

H. Attorney's Fees and Costs

Finally, this Court awards reasonable attorney's fees pursuant to the IDEA. See 20 U.S.C. § 1415(i)(3). "The IDEA grants courts the discretionary power to 'award reasonable attorneys' fees. . .[to] the prevailing party' '[i]n any action or proceeding brought under' the IDEA." A.R. v. New York City Dep't of Educ., Nos. 02 CV 9471, 02 CV 9472, 02 CV 9473, 2005 WL 1088427, at *1 (2d Cir. May 10, 2005). Under the IDEA, fees must be "reasonable," "based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished." 20 U.S.C. § 1415(i)(3)(B) - (C). The courts apply a "lodestar" method, multiplying the hours reasonably expended on the litigation by a reasonable hourly rate. See A.R. v. New York City Dep't of Educ., 2005 WL 1088427 at * 11 (citations omitted).

Accordingly, before this Court can award attorney's fees, there must be a calculation of the

51

reasonable hourly rate and reasonable hours expended. Therefore, plaintiffs are ordered to submit

papers in support of their award of costs and attorney's fees within two weeks of this Order by

June 24, 2005. The papers should include an affidavit setting forth the basis and method for

calculating default damages and attorney's fees, if requested, along with any supporting

documentation. Defendant's response is due July 15, 2005.


## CONCLUSION

Accordingly, under the equitable powers of this Court, the Court grants summary

judgment in favor of the plaintiffs. The defendant is ORDERED to reimburse plaintiffs for the

cost of tuition at the Star program for the 2000-2001 school year. Additionally, the defendant is

ORDERED to reimburse plaintiffs for the cost of at home ABA therapy provided to W.B., up to

27.5 hours per week, for the 2000-2001 school year, and any other costs for related services

starting from August 2000 to August 2001.

**SO ORDERED.**

Dated: Brooklyn, New York
June 10, 2005

Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York